IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID CHMIEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civ. A. No. 18-1691 |
| PENNSYLVANIA DEPARTMENT OF | ) |
| CORRECTIONS, et al., | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM OPINION**

Plaintiff David Chmiel ("Plaintiff"), an inmate currently incarcerated at the State Correctional Institution at Greene ("Prison"), commenced this action against multiple defendants under 42 U.S.C. § 1983. He alleges that by not providing regular diabetic eye examinations necessary to detect diabetic retinopathy, the Prison's administrative and medical staff were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Plaintiff also claims that the Pennsylvania Department of Corrections ("DOC") discriminated against him on the basis of his diabetes and diabetic retinopathy in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794(a).

Named as Defendants in Plaintiff's Amended Complaint are the DOC; the Prison's Health Care Administrators Guth and Nicholson; the Prison's former and current medical directors, Drs. Jin and Smyth, respectively; Prison physicians Russell, Santos, Park, Dascani and Valley; and Michael Hice, a phlebotomist at the Prison (sometimes collectively referred to as "Defendants").

Presently pending before the Court are motions to dismiss Plaintiff's Amended Complaint which have been asserted by all Defendants except Michael Hice, who has filed an Answer. For the reasons stated herein, the motions to dismiss of Dr. Valley and Dr. Santos will be granted and those of all other Defendants will be denied.

## I. PROCEDURAL BACKGROUND

After Plaintiff commenced this in December 2018, all defendants other than Defendant Hice filed motions to dismiss his Complaint. Subsequently, with leave of Court, Plaintiff filed an Amended Complaint (ECF No. 75, "Am. Compl."), which rendered Defendants' motions moot.

All defendants other than Defendant Hice have moved to dismiss the Amended Complaint. These motions have been fully briefed and are ripe for disposition.

## II. RELEVANT FACTUAL BACKGROUND

As alleged in the Amended Complaint, Plaintiff was diagnosed with Type 2 diabetes as early as 1999 while incarcerated in a DOC institution. (Am. Compl. ¶ 34.) He was transferred to SCI Greene in 2002. (*Id.* ¶ 35.) In October 2016, Dr. Russell referred Plaintiff to medical care outside of the Prison and he was diagnosed by an opthamologist in Janaury 2017 with "early diabetic retinopathy and cateracts in both eyes." (*Id.* ¶ 52.) According to the National Eye Institute, diabetic retinopathy "involves changes to retinal blood vessels that can cause them to bleed or leak fluid, distorting vision," and is the "most common cause of vision loss among people with diabetes." (*Id.* ¶¶ 20, 22.)

A month after being diagnosed with diabetic retinopathy, the surgeon performing Plaintiff's double eye laser surgery told him that it may be too late to save his left eye and asked him why it took so long to get his eyes checked. (*Id.* ¶ 53.) Plaintiff asserts that since that time, his condition has

2

only worsened, leaving him essentially blind in one eye. (*Id.* ¶ 54.) In March 2017, he was diagnosed with proliferative diabetic retinopathy, the most advanced form of this condition, as well as "traction retinal detachment." (*Id.* ¶¶ 55, 56.) Subsequently, Plaintiff allegedly received an "even worse diagnosis," high risk proliferative diabetic retinopathy and a combined tractional and rhegmatogenous retinal detachment in his left eye, and was also noted as having decreased vision. (*Id.* ¶¶ 57–58.)

According to the allegations in the Amended Complaint, in order to screen for and prevent diabetic retinopathy the American Diabetic Association urges medical providers to regularly administer a dilated eye exam called a fundoscopy, which allows the physician to examine a patient's retina and optic nerve for signs of damage and other eye problems. (*Id.* ¶¶ 23–25.) For patients who show no signs of retinopathy, the recommended frequency of this examination is at least every one to two years. (*Id.* ¶ 27.) Those manifesting any level of diabetic retinopathy, however, should receive these examinations at least annually by an ophthalmologist or an optometrist. (*Id.*) If a patient's retinopathy is progressing or sight-threatening, they should receive examinations more frequently. (*Id.* ¶ 28.) Without regular fundoscopies and proper treatment, retinopathy can progress to proliferative diabetic retinopathy. (*Id.* ¶ 32.) At this stage, patients face a serious risk of retinal detachment and permanent vision loss. (*Id.*) Therefore, Plaintiff claims, a fundoscopy is an essential tool to ensure proper treatment of patients with Type 2 Diabetes. (*Id.* ¶ 26.)

During his incarceration, Plaintiff asserts, he frequently complained to medical personnel about his eyesight. (*Id.* ¶ 35.) Dr. Russell performed two fundoscopies on Plaintiff, once in 2002 and again in 2008, six years later. (*Id.*) Thereafter, the only eye exams performed on Plaintiff were

3

Snellen tests, which do not involve either dilation or examination of the retina or optic nerve. (*Id.* ¶ 36.) As Plaintiff's vision deteriorated, Dr. Russell simply wrote prescriptions for glasses of increasing strength, which treated the symptom (poor vision) but not the underlying problem (retinopathy). (*Id.* ¶ 37.)

Plaintiff alleges that as reflected in his medical records, the medical staff, including Drs. Park, Jin, and Dascani, characterized his diabetes as poorly controlled or uncontrolled. (*Id.* ¶ 38.) Drs. Russell, Santos, Jin, Park, Dascani, Valley, and Smyth each treated him and had access to his medical records. (*Id.* ¶ 39.) Thus, Plaintiff claims, each of these medical professionals knew that he was a diabetic, that his diabetes was poorly controlled, and knew or should have known that he was at a greater risk for developing severe diabetic retinopathy. (*Id.* ¶ 40.) Despite their awareness of Plaintiff's high risk of developing diabetic retinopathy, Defendants chose not to administer an annual fundoscopy. (*Id.* ¶ 41.) Plaintiff asserts that this is the "best tool" for screening and preventing this condition. (*Id.*)

According to the Amended Complaint, Health Care Administrators ("HCAs") Guth and Nicholson are responsible for ensuring that all inmates at the Prison have an opportunity to receive adequate health care and that those with special medical needs have a periodic health review. (*Id.* ¶¶ 8, 9.) Their responsibilities include overseeing the DOC staff, including all medical personnel, in order to coordinate health care services at the Prison. (*Id.* ¶ 46.) Plaintiff alleges that HCAs Guth and Nicholson refused to allow him to schedule medical appointments and otherwise did not ensure that he received the appropriate treatment for his medical needs. (*Id.* ¶ 47.) The Amended Complaint also alleges that Defendant Hice refused Plaintiff access to medical care. (*Id.* ¶ 49.)

As alleged in the Complaint, it is the Prison's standard practice to deny fundoscopies to high risk diabetic patients. (*Id.* ¶ 59.) The DOC, HCAs Guth and Nicholson, and Drs. Jin and Smyth are aware of this practice and approved its continued implementation despite knowing that individuals with diabetes such as Plaintiff should receive comprehensive eye exams, including fundoscopies, on at least a biannual basis. (*Id.* ¶ 60.) Due to Defendants' deliberate indifference, Plaintiff alleges, he now suffers from diabetic retinopathy. (*Id.* ¶ 61.) Plaintiff claims that Defendants do not deny proper chronic care or regular diagnostic exams wholesale to prisoners suffering from other chronic conditions. (*Id.* ¶ 62.) Rather, Plaintiff attributes Defendants' failure to provide him with proper chronic care to his diagnosis as a diabetic. (*Id.* ¶ 63.)

Plaintiff claims that as a direct result of Defendants' denial of proper medical treatment, he developed diabetic retinopathy, putting him at grave risk of permanent vision loss. (*Id.* ¶¶ 51, 65.) Further, he alleges, the DOC's failure to accommodate his impaired vision prevents him from receiving equal benefits from the Prison's services and programs. (*Id.* ¶ 66.) Specifically, Plaintiff is unable read books at the library, take a job, or go out to the yard, and has difficultly bathing in the shower. (*Id.* ¶¶ 67, 70, 71, 72.)

### III. STANDARD OF REVIEW

A valid complaint requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a Rule 12(b)(6) motion, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be

entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). While "accept[ing] all of the complaint's well-pleaded facts as true," the court "may disregard any legal conclusions." *Id.* at 210–11.

To survive the motion, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). In sum, the plaintiff "must plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10 (2014).

To assess the sufficiency of a complaint under *Twombly* and *Iqbal*, a court must take three steps: (1) outline the elements the plaintiff must plead to state a claim for relief; (2) peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth; (3) look for well-pled factual allegations, assume their veracity, and then determine whether they plausibly give rise to an entitlement to relief. *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). The court's plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In ruling on a Rule 12(b)(6) motion, courts generally consider only the complaint, exhibits, and matters of public record. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). A court may also consider "items subject to judicial notice," without converting the motion to dismiss into one for

summary judgment. *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1357 (2004)).

## IV. DISCUSSION

In Count I of his Amended Complaint, Plaintiff asserts § 1983 claims against all Defendants except the DOC for deliberate indifference to his serious medical needs in violation of the Eighth Amendment. The remaining two counts are asserted against only the DOC. Count II pleads a cause of action for discrimination and exclusion from services of a public entity in violation of the ADA, while Count III asserts a claim for discrimination and exclusion from services of a federally funded entity in violation of the RA.

The Court will discuss each of these claims in turn. Before analyzing Plaintiff's substantive claims, however, the Court will address whether Plaintiff exhausted the Prison's administrative remedies.

### A. Exhaustion of administrative remedies

Drs. Dascani, Jin, Park, Smyth, and Valley seek dismissal based on Plaintiff's failure to exhaust administrative remedies as required by the Prison Litigation Reform Act ("PLRA").

The PLRA prohibits an inmate from bringing any action concerning prison conditions absent exhaustion of available administrative remedies. 42 U.S.C. § 1997e(a). This exhaustion requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The PLRA further mandates that inmates properly exhaust administrative remedies before filing suit in federal court. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules

7

because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 91. Accordingly, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). "Failure to exhaust administrative remedies is an affirmative defense that must be pled and proven by the defendant[s]." *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002) (citing *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002)).

Here, Drs. Dascani, Jin, Park, Smyth, and Valley do not dispute that Plaintiff filed and fully exhausted a grievance with respect to the allegations in the Amended Complaint.[1] They maintain, however, that Plaintiff failed to comply with the PLRA's exhaustion mandate because he procedurally defaulted by not naming them personally in that grievance.

As an initial matter, that Court notes that the Supreme Court has "identified the benefits of exhaustion to include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219. Indeed, the "primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued." *Id.* (quoting *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004)). Therefore, "exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievances." *Id.*

---

[1] Drs. Dascani, Jin, Park, Smyth, and Valley have submitted Plaintiff's grievance record in support of their motions to dismiss. (ECF Nos. 80-1; 87-1 ("Grievance").) "Given that the exhaustion issue turns on the indisputably authentic documents related to [Plaintiff's] grievance[]," the Court may consider such records without converting their motion into one for summary judgment. *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004).

However, since "prison grievance procedures supply the yardstick for measuring procedural default[,]" the starting point of the Court's analysis is the grievance policy in effect at the Prison during the relevant time.[2] *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004). That policy provides that, in filing a grievance, "[t]he inmate shall identify individuals directly involved in the event(s)." DC-ADM 804, §1.A.11.b. The policy, however, also permits "[a]n inmate who has been personally affected by a Department and/or facility action or policy" to submit a grievance. *Id.* §1.A.13. I

Plaintiff's grievance record reflects that he filed Grievance No. 667375 on March 3, 2017. (Grievance at 52.) In that grievance, Plaintiff indicates that he is filing a grievance "against the Medical Department and the DOC, for: (1) deliberate and malicious deprivation of adequate medical care and need in a timely manner, (2) unethical delay of eye care, [and] (3) 8th Amendment rights to be free from cruel and unusual punishment, by the Defendants, John Mcanneny, Mr. Nicholson, Dr. Santos, Mike Hice, Gilmore, [and] John Wetzel." (*Id.*) Plaintiff's grievance also alleges that he had suffered from poor eyesight for "over two years" and that the Prison's medical department had done "nothing" to treat it. (*Id.* at 53.)

In denying Plaintiff's grievance at the initial review response, a Prison health care administrator acknowledged that Plaintiff's grievance was premised on the fact that "the medical department waited too long to have [his] vision checked causing an unnecessary delay which may lead to blindness" (*Id.* at 54.) In upholding this initial denial upon Plaintiff's appeal, the Prison's facility manager also referenced the medical department in his iteration of Plaintiff's grievance. (*Id.* at 56.) On final appeal, Plaintiff's grievance was referred to the Director of the Bureau of Health

---

[2] The policy is posted on the DOC website and is accessible at: http://www.cor.pa.gov/Ab out%20Us/Documents/DOC%20Policies/804%20Inmate%20Grievances.pdf; *see also* (ECF No. 90-1.).

9

Care Services who, too, characterized Plaintiff's grievance as a complaint "regarding the medical care given by the medical department of [the Prison]." (*Id.* at 49, 50.)

At this point in the proceedings, the Court concludes that there are material issues of fact regarding whether Plaintiff procedurally defaulted by naming only the "Medical Department" and not individual physicians. Whether the Prison officials were on notice of the identity of the doctors accused of wrongdoing and whether the Prison acknowledged that these doctors were fairly within the scope of Plaintiff's grievance cannot be resolved in this case on a motion to dismiss. *See Spruill*, 372 F.3d at 234

Moreover, there is insufficient record evidence regarding which physicians had rendered treatment to Plaintiff as of the date of the grievance or Plaintiff's knowledge of the identity of such physicians. As such, any motions to dismiss premised on Plaintiff's failure to exhaust administrative remedies must be denied without prejudice to move for summary judgment on this issue once additional evidence has been developed.

Drs. Dascani, Jin, Park, and Smyth sought dismissal only on the exhaustion grounds. On the other hand, Dr. Valley seeks dismissal of Plaintiff's claim against him on the merits as well. The Court will address those arguments in its analysis of Plaintiff's substantive claims.

B. Section 1983 Claims (Count I – All Defendants except the DOC)

Section 1983 provides a private citizen with the right to bring an action against any person who under color of state law deprives him of a right or privilege secured by the Constitution of the United States. 42 U.S.C. § 1983. This statute does not create substantive rights but instead "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a viable § 1983 claim, a plaintiff

"must establish that []he was deprived of a federal constitutional or statutory right by a state actor." *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009). Because there is no question Defendants acted under color of state law, the Court's analysis focuses on whether Plaintiff has sufficiently alleged a deprivation of his constitutional rights under the Eighth Amendment.

It is well established that "[t]he Eighth Amendment, through its prohibition on cruel and unusual punishment, prohibits the imposition of 'unnecessary and wanton infliction of pain contrary to contemporary standards of decency.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)). "The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health." *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009) (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)). Accordingly, in order to establish an inadequate medical treatment claim under the Eighth Amendment, "a plaintiff must make (1) a subjective showing that 'the defendants were deliberately indifferent to [his or her] medical needs' and (2) an objective showing that 'those needs were serious.'" *Pearson*, 850 F.3d at 534 (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)).

Here, Defendants do not dispute that Plaintiff has a serious medical need. The only issue, therefore, is whether Plaintiff has alleged sufficient facts, for purposes of a motion to dismiss, to support an inference that Defendants were deliberately indifferent to that need.

The Third Circuit has explained "that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" *Rouse*, 182 F.3d at 197. Rather, for a prison official "[t]o act with deliberate indifference to serious medical needs [of a prisoner] is to recklessly disregard a substantial risk of serious harm." *Giles*, 571 F.3d at 330 (citing

*Estelle v. Gamble*, 429 U.S. 97, 104–105 (1976); *Farmer*, 511 U.S. at 836). "Under [this] recklessness standard, 'prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk.'" *Id.* (quoting *Farmer*, 511 U.S. at 844). The Third Circuit has found deliberate indifference to exist in various scenarios including where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; (3) prevents a prisoner from receiving needed or recommended medical treatment. . . . [or (4)] persists in a particular course of treatment in the face of resultant pain and risk of permanent injury." *Rouse*, 182 F.3d at 197 (citations and quotations marks omitted). Deliberate indifference may be shown by intentionally denying or delaying medical care. *Estelle*, 429 U.S. at 104–105.

In sum, if the alleged inadequate care "was a result of an error in medical judgment," then Plaintiff's claims must fail. *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993). If the failure to provide adequate care was deliberate and motivated by non-medical factors, however, then Plaintiff's claims are actionable.

### i. Dr. Russell

Plaintiff has alleged that despite knowing about his high risk for developing diabetic retinopathy, Dr. Russell deliberately chose not to administer an annual fundoscopy which was the best tool for screening and preventing this condition. (Am. Compl. ¶ 41.) Plaintiff asserts that the fact that Dr. Russell allegedly performed two fundoscopies on Plaintiff over a six-year span, in 2002 and 2008, supports an inference that he recognized the risk that Plaintiff could develop diabetic retinopathy and nonetheless intentionally delayed or denied medical care. (*Id.* ¶ 35.) Yet, as

Plaintiff's vision deteriorated, Dr. Russell "persisted in a particular course of treatment," i.e., prescribing glasses of increasing strength (*Id.* ¶ 37), while ignoring the "risk of permanent injury," i.e., blindness, associated with diabetic retinopathy. *Rouse*, 182 F.3d at 197. For the limited purpose of resolving a motion to dismiss, these allegations are sufficient to state a claim that Dr. Russell acted with deliberate indifference because he knew that Plaintiff required fundoscopies but deliberately stopped administering them after 2008. Accordingly, Dr. Russell's motion will be denied.

### *ii. Drs. Valley and Santos*

Plaintiff alleges that Drs. Valley and Santos were both physicians at the Prison. (Am. Compl. ¶¶ 12, 15.) The only other allegation that specifically references Drs. Valley and Santos is that they, along with Drs. Russell, Jin, Park, Dascani, Robinson and Smyth, treated Plaintiff and had access to his medical records. (*Id.* ¶ 39). The remaining allegations in the Amended Complaint refer to all Defendants generally, and allege that they knew that Plaintiff was diabetic, that his diabetes was poorly controlled, and that they knew or should have known that he was at a greater risk for developing severe retinopathy but, despite this awareness deliberately chose not to administer an annual fundoscopy to Plaintiff (*Id.* ¶¶ 40–41.) Significantly, Plaintiff alleges that a fundoscopy is the "best tool" for screening and preventing retinopathy, not that it is the only tool. (*Id.* ¶ 41.)

While Plaintiff alleges general allegations against all Defendants, these allegations fail to plead any specific acts or omissions of Drs. Valley and Santos that would state a claim for deliberate indifference to Plaintiff's serious medical needs. At best, the allegations against them are that they failed to use the "best tool" to screen for retinopathy, not that they failed to treat him at all. While this may be enough to plead a negligence claim, it is not sufficient to state a claim for deliberate

13

indifference to a serious medical need.

"A District Court has discretion to deny a plaintiff leave to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose not to resolve them." *Astrazeneca Pharm. L.P.*, 769 F.3d at 849 (3d Cir. 2014) (quoting *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 144 (3d Cir. 2002)). Here, Plaintiff amended his original complaint after Drs. Valley and Santos sought dismissal based upon a lack of factual allegations against them. Plaintiff has not added any factual specificity in his Amended Complaint regarding the alleged conduct of Drs. Valley and Santos. Therefore, the Court declines to grant Plaintiff leave to amend his Amended Complaint.

Because there are no factual allegations in the Amended Complaint supporting the inference that Drs. Valley and Santos were deliberately indifferent to Plaintiff's serious medical needs, their motions to dismiss will be granted.

### iii. *HCAs Guth and Nicholson*

HCAs Guth and Nicholson argue that because they are not medical staff, absent reason to believe that Plaintiff was being mistreated or not treated appropriately they cannot be found to be deliberately indifferent. *See Durmer*, 991 F.2d at 69 ("[Non-physician prison officials] can[not] be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.") They assert that Plaintiff's failure to allege that they knew or should have known about any mistreatment necessitates dismissal of his claims against them.

As a preliminary matter, the Court notes that Plaintiff has, in fact, alleged that Defendants knew or should have known that he never received proper medical care. (Am. Compl. ¶ 50.) Additionally, while it is true that "[i]f a prisoner is under the care of medical experts . . . , a non-

medical prison official will generally be justified in believing that the prisoner is in capable hands [,]" *Spruill*, 372 F.3d at 236, that factual scenario is not implicated here. Rather, Plaintiff has alleged that he was not receiving the proper treatment—i.e., annual fundoscopies—by the medical staff and that HCAs Guth and Nicholson knew this and failed to provide him with that treatment despite knowing that it was necessary.

HCAs Guth and Nicholson also contend that Plaintiff has not pleaded their personal involvement in the alleged deprivation of his constitutional rights. Under § 1983, a defendant must be shown to have had personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted). A § 1983 plaintiff has two avenues for establishing supervisory liability. First, "[i]ndividual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'" *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir.1989)). Second, "a supervisor may be personally liable . . . if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Id.*

Regarding the first avenue for establishing supervisory liability, Plaintiff alleges HCAs Guth and Nicholson knowingly approved the Prison's standard practice to deny fundoscopies to high risk patients like him. (Am. Compl. ¶¶ 59–60.) These allegations reflect that HCAs Guth and Nicholson "'turned a blind eye to an obviously inadequate practice that was likely to result in the violation of

constitutional rights' such that they, as 'policymaker[s,] can reasonably be said to have been deliberately indifferent to [Plaintiff's serious medical] need.'" *Parkell v. Danberg*, 833 F.3d 313, 338 (3d Cir. 2016) (quoting *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003)).

Similarly, with respect to the second potential avenue of potential liability, the Amended Complaint alleges that HCAs Guth and Nicholson oversaw the Prison's medical department and were responsible for ensuring not only that proper medical treatment was provided to all inmates, but also that those with special medical needs, such as Plaintiff, received a periodic health review. (Am. Compl. ¶¶ 8, 9, 46.) Yet, according to Plaintiff, they refused to allow him to schedule medical appointments to ensure that he received necessary medical care, i.e., fundoscopies, that the Prison's medical department had not provided. (*Id.* ¶ 48.) These allegations sufficiently state a claim that HCA Guth and Nicholson knew of, participated in, or acquiesced in the denial of annual fundoscopies to Plaintiff from 2008 until he was ultimately diagnosed with diabetic retinopathy in 2017.

In sum, the Amended Complaint sufficiently pleads that HCAs Guth and Nicholson were personally involved in the alleged wrongs. Accordingly, their motion to dismiss will be denied.

### C. ADA and RA Claims (Count II & III – DOC only)

Title II of the ADA provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. It is well established that "[s]tate prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or

other instrumentality of a State or States or local government.'" *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (quoting 42 U.S.C. § 12131(1)(B)); *see also Chisolm v. McManimon*, 275 F.3d 315, 325 (3d Cir. 2001) ("Title II of the ADA applies to services, programs and activities provided within correctional institutions.").

The RA provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 U.S.C. § 794(a). The Third Circuit has explained that "[t]he substantive standards for determining liability under the [RA] and the ADA are the same." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 275 (3d Cir. 2014) (quoting *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 282–83 (3d Cir. 2012)); *see* 29 U.S.C. § 794(d).

Therefore, to state a claim under either the ADA or the RA a plaintiff "must allege that he is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability." *Furgess v. Pennsylvania Dep't of Corr.*, 933 F.3d 285, 289 (3d Cir. 2019). Here, the DOC does not dispute that Plaintiff is a qualified individual with a disability. The only issue, therefore, is whether Plaintiff has alleged facts supporting the inference that he is either precluded from participating in the Prison's services, or otherwise discriminated against because of his disability.

The allegations of Amended Complaint confirm that Plaintiff has plausibly alleged that he is precluded from participating in various programs, services, or activities by reason of his disability—i.e., his impaired vision due to diabetic retinopathy. (Am. Compl. ¶¶ 65–66.) Specifically, Plaintiff alleges that the DOC's failure to provide him with appropriate accommodations with respect to his

17

impaired vision effectively prevents him from receiving equal benefit of various non-medical services at the Prison—i.e., library, showers, yard access etc. (*Id.* ¶¶ 67, 71, 72.) Additionally, Plaintiff's Amended Complaint plausibly alleges that the DOC subjected him to discriminatory treatment by reason of his disability—i.e., his diagnosis as a diabetic. (*Id.* ¶ 63.) Plaintiff has alleged that the DOC knowingly approved the Prison's standard practice to deny fundoscopies to high risk diabetic patients like him. (*Id.* ¶¶ 59–60.) This practice is discriminatory because, as alleged, the DOC does not have a blanket policy of denying proper chronic care or regular diagnostic exams to prisoners suffering from chronic conditions other than diabetes. (*Id.* ¶ 62.)

In sum, Plaintiff has stated a proper claim under the ADA and the RA. Accordingly, the DOC's motion to dismiss will be denied.

## V. CONCLUSION

Based on the foregoing, the motions to dismiss filed by Dr. Valley and Dr. Santos will be granted and those submitted by Dr. Dascani, Dr. Jin, Dr. Park, Dr. Smyth, Dr. Russell, HCAs Guth and Nicholson, and the DOC will be denied. Appropriate orders will follow.

BY THE COURT:

Patricia L. Dodge
United States Magistrate Judge

Dated: March 23, 2020